## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANN C. WALSTROM, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:2006-81 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF ALTOONA, | ) | JUDGE GIBSON |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment (Document No. 28) filed by the Defendant pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, this motion will be granted in its entirety.

### II. BACKGROUND

The City of Altoona ("Altoona"), the Defendant in this case, is a municipality created and maintained under the laws of Pennsylvania. Document No. 41, p. 2, ¶ 4. Plaintiff Ann C. Walstrom ("Walstrom") became a secretary for the Altoona Police Department ("APD") in 1982. *Id.*, p. 3, ¶ 5. In 1992, by resolution of the Altoona City Council, Walstrom was hired as a police officer for Altoona. *Id.*, ¶ 6. In that capacity, she was a member of both the Patrol Division and the Collective Bargaining Unit. *Id.*, ¶ 7.

In November 1997, during a work-related training class, Walstrom sustained a torn ligament in

1

her right elbow. *Id.*, ¶ 8. While being treated for her injury, Walstrom received worker's compensation benefits. *Id.*, pp. 3-4, ¶ 9. She did not return to work until January 5, 1999. *Id.*, p. 4, ¶ 10. Prior to her return, Walstrom was informed by Captain Janice Freehling ("Freehling") that she would have to participate in a two-week re-acclimation program. *Id.*, ¶ 11. Walstrom apparently believed that, after the re-acclimation program, she would be scheduled to work on the first shift, which was a daylight shift. *Id.*, ¶ 12.

Lieutenant John Carnicella ("Carnicella") was responsible for scheduling officers to work shifts for the Patrol Division. *Id.*, pp. 4-5, ¶ 13. Carnicella did not have oral communications with Walstrom prior to her return, since he had been told that Freehling was responsible for all correspondence with Walstrom. *Id.*, p. 5, ¶ 14. Nevertheless, in a memorandum dated December 17, 1998, Carnicella informed Walstrom that she would be assigned to a field training program upon her return to work. Document No. 40-2, p. 74. Because she was just returning from an extended leave, Walstrom was placed with a field training officer. Document No. 41, p. 5, ¶ 16. This arrangement was designed to help Walstrom become reacquainted with her duties. *Id.*, pp. 5-6, ¶ 17.

Around that same time, Carnicella realized that he needed someone to fill an evening shift at the Fairview Hills housing project. *Id.*, p. 6, ¶ 18. Carnicella typically filled such evening shifts at Fairview Hills with officers who had just completed their training programs, assigning them for periods of approximately three months. *Id.*, ¶ 19. Although he realized that an assignment to work at Fairview Hills was less than ideal for many officers, Carnicella did not consider such an assignment to be demeaning. *Id.*, pp. 6-7, ¶¶ 20-21. Carnicella believed that assigning Walstrom to patrol at Fairview Hills was a good idea, since she had worked there for three months on a prior occasion and was not yet

2

acclimated to a particular shift. *Id.*, p. 7, ¶¶ 22-24. Carnicella anticipated that Walstrom's assignment would last for approximately three months. *Id.*, ¶ 24.

Walstrom and her husband had apparently told Freehling that Walstrom needed to work a daylight shift in order to fulfill the needs of their children. *Id.*, pp. 8-9, ¶¶ 27-28. Upon her return to work on January 5, 1999, Walstrom rode with a field training officer for approximately six hours. *Id.*, p. 9, ¶ 30. At some point during the shift, Walstrom received a letter from Carnicella indicating that, as of January 19, 1999, she would be transferred to the evening shift at Fairview Hills.[1] *Id.*, ¶ 31. Walstrom was surprised to learn of this assignment, since she had been under the impression that she would be working a day shift after the completion of her training. *Id.*, pp. 9-10, ¶ 32. After learning of her impending assignment, Walstrom became emotionally distraught. *Id.*, p. 10, ¶ 33. She left work in tears. *Id.*, p. 11, ¶ 37. Although the assignment was clearly not embraced by Walstrom, it did not constitute a demotion. *Id.*, p. 10, ¶ 34. Her job description, pay and rank all remained the same. *Id.*, ¶ 35. Despite her frustration, Walstrom did not attempt to contact Freehling about the assignment. *Id.*, pp. 10-11, ¶ 36.

Walstrom subsequently sought medical treatment from both her family physician and a psychiatrist. *Id.*, p. 11, ¶ 38. She indicated that she was unable to return to her job as a police officer. *Id.*, ¶ 39. Her husband, James Walstrom ("James"), began to deal with Altoona on her behalf. *Id.*, p. 12, ¶ 41. As a supervisory narcotics agent for the Pennsylvania Office of Attorney General, James typically interacted with the Deputy Chief of the APD on a daily basis. *Id.*, ¶ 42. The day after

---

[1]The record contains a memorandum dated December 23, 1998, from Carnicella to Walstrom. Document No. 40-2, p. 75. Walstrom's assignment to Fairview Hills is described in that memorandum. *Id.* Walstrom apparently did not receive the memorandum until her return to work on January 5, 1999.

3

Walstrom left work, James informed Carnicella and Freehling by telephone that Walstrom was unable to work and under a doctor's care. *Id.*, ¶ 43. In late January 1999, James told Chief John F. Treese ("Treese") that Walstrom was upset about both the Fairview Hills assignment and being passed over for promotion. *Id.*, pp. 12-13, ¶ 44.

In a memorandum dated March 22, 1999, Treese informed Walstrom that her last day of sick leave would be exhausted as of March 27, 1999, and that the following two days were her "relief days." Document No. 40-3, p. 69. Walstrom was instructed to contact Treese or Freehling about her intentions as of March 30, 1999. *Id.* After receiving the memorandum, James contacted Freehling and explained that Walstrom was unable to return to her duties as a police officer. Document No. 41, p. 13, ¶ 46. Although James and Freehling spoke about worker's compensation benefits, no claim was filed on Walstrom's behalf. *Id.*, ¶ 47. Freehling told James that Walstrom would begin to use her paid leave time. *Id.*, pp. 13-14, ¶ 48.

On April 26, 1999, Freehling sent Walstrom a memorandum stating that her last day of paid leave would be April 30, 1999. Document No. 40-3, p. 70. Walstrom was advised that she should contact either Freehling or Michael Eggert ("Eggert"), the Personnel Director, about her intentions for the future. *Id.* Altoona apparently received no response from Walstrom. In a letter dated May 12, 1999, Eggert informed Walstrom that her employment with the APD would be terminated as of May 21, 1999, unless she could provide an adequate written justification for the continuation of her employment. Document No. 40-5, p. 14. The letter indicated that Walstrom's position could not remain open indefinitely. *Id.* Walstrom's attorney responded on May 20, 1999, by forwarding to Eggert a previous letter from Dr. James P. Mahan ("Dr. Mahan") to Dr. Brett Scharf ("Dr. Scharf") dated

4

February 2, 1999. *Id.*, pp. 15-17. The letter from Walstrom's attorney specifically stated that the letter from Dr. Mahan was being offered "in support of a request for disability retirement," and that Walstrom was "unable to return to duty." *Id.*, p. 15. The attached letter from Dr. Mahan to Dr. Scharf indicated that Walstrom was suffering from "an adjustment disorder with depressed mood and anxiety," and that her problems with the APD were "probably the cause of her depressed mood." *Id.*, p. 16. Walstrom was apparently being treated with Zoloft, which is an antidepressant. *Id.*

James Weakland ("Weakland"), Altoona's City Manager, gave Eggert authorization to send Walstrom a termination letter. Document No. 41, p. 17, ¶ 59. In a letter dated May 24, 1999, Eggert informed Walstrom that her employment with the APD had been terminated as of May 21, 1999. Document No. 40-5, p. 18. Eggert's letter stated that the previous letter from Walstrom's attorney, along with the attached letter from Dr. Mahan to Dr. Scharf, was being forwarded to the Police Retirement Board so that Walstrom's request for a "disability retirement" could be acted upon. *Id.* The letter expressed regret that Walstrom's "medical status" had made it "impossible" for her to continue working as a police officer. *Id.*

At the time of Walstrom's termination, the collective bargaining agreement ("CBA") which governed the terms of her employment with the APD provided for a four-step grievance process. Document No. 41, p. 19, ¶ 65. No grievance was filed by Walstrom concerning the termination of her employment. *Id.*, ¶ 66. The matter was never appealed to the Civil Service Commission. *Id.*, pp. 19-20, ¶ 67. Walstrom never applied for disability benefits under Titles II and XVI of the Social Security Act [42 U.S.C. §§ 401-433 and 1381-1383(f)]. *Id.*, p. 20, ¶ 69. Since her discharge, Walstrom has not sought employment. *Id.*, p. 27, ¶ 97. She continues to receive treatment from a psychologist for mental

5

ailments which she believes to have been caused by her termination. *Id.*, pp. 26-27, ¶ 94. She has a prescription for Celexa and sometimes takes a "sleeping pill." *Id.*, p. 27, ¶ 96. Walstrom is unsure as to whether she will seek future employment as a police officer. *Id.*, ¶ 95.

On January 4, 2001, Walstrom filed a praecipe for a writ of summons against Altoona and Treese in the Pennsylvania Court of Common Pleas of Blair County. Document No. 40-8. On February 2, 2001, Walstrom filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") pursuant to 43 PA. STAT. § 959, alleging that she had been illegally discharged on the basis of her gender and disability. Document No. 31-11, pp. 3-25. She also alleged that, in 1997, Treese had denied her a promotion to a corporal or detective position with the APD's Criminal Investigation Division because of her gender. *Id.*, p. 25. Walstrom further indicated that she had first learned of Treese's reason for not promoting her in August 2000, when a retired APD official told her that Treese believed that women had no place in law enforcement and were undeserving of promotions.[2] *Id.*, pp. 12, 25. On May 17, 2001, Walstrom filed an amended complaint with the PHRC. *Id.*, pp. 26-29. Among other things, Walstrom alleged that several male officers had been off duty for several years because of work-related injuries, and that they had not been terminated. *Id.*, p. 28. The amended complaint was dual-filed as a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. §§ 2000e-5(b) and 12117(a). *Id.*, p. 29.

In a letter dated June 1, 2005, the PHRC dismissed Walstrom's complaint on the ground that probable cause did not exist to credit her allegations of unlawful discrimination. Document No. 31-12,

---

[2] In her brief, Walstrom indicates that the retired APD official referenced in her complaint to the PHRC was Carnicella, and that the information concerning the alleged reason for Treese's failure to promote Walstrom (*i.e.*, her sex) was relayed to James by Carnicella on August 25, 2000. Document No. 40, p. 13.

p. 2. Although Walstrom objected to the dismissal of her complaint, she has apparently never received

a formal dismissal of that objection from either the PHRC or the EEOC. Document No. 41, p. 21, ¶ 74.

On April 7, 2006, Walstrom commenced this action against Altoona, alleging violations of the Due

Process Clause of the Fourteenth Amendment to the United States Constitution, the Rehabilitation Act

[29 U.S.C. § 701 *et seq.*], and the Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951

*et seq.*]. Document No. 1. Her Fourteenth Amendment claim was brought pursuant to 42 U.S.C. §

1983. *Id.* Altoona filed a Motion for Summary Judgment on February 4, 2008. Document No. 28.

That motion is the subject of this Memorandum Opinion.

## III. SUMMARY JUDGMENT STANDARDS

> Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91
> L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine
> "if the evidence is such that a reasonable jury could return a verdict for the nonmoving
> party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91
> L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all
> reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. and
> Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)].

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller,
> & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality
> inquiry is independent of and separate from the question of the incorporation of the
> evidentiary standard into the summary judgment determination. That is, while the
> materiality determination rests on the substantive law, it is the substantive law's
> identification of which facts are critical and which facts are irrelevant that governs. Any
> proof or evidentiary requirements imposed by the substantive law are not germane to
> this inquiry, since materiality is only a criterion for categorizing factual disputes in their

relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## IV. JURISDICTION AND VENUE

The Court has jurisdiction over Walstrom's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over her state claims pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Although Walstrom initially asserted a claim against Altoona under § 1983 for an alleged violation of the Due Process Clause of the Fourteenth Amendment, she now stipulates to the dismissal of that claim. Document No. 40, p. 15. Consequently, the Court will grant Altoona's Motion for Summary Judgment as to that claim without further inquiry. The only remaining claims before the Court arise under the Rehabilitation Act and the PHRA. Walstrom's claims for disability-based discrimination arise under both the Rehabilitation Act and the PHRA, while her claims for sex-based discrimination arise solely under the PHRA. Document No. 1, ¶¶ 37-46, 56-59. Because of the procedural history of this case, however, the Court need not address the merits of Walstrom's claims. It is clear that all of her claims are barred by the applicable statutes of limitations.

### A. The Rehabilitation Act Claims

Walstrom's federal claims arise under § 504 of the Rehabilitation Act, the present version of which is codified at 29 U.S.C. § 794(a). The applicable statutory provision provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or

8

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).[3] Altoona does not dispute that its operations constitute a "program or activity" within the meaning of the Rehabilitation Act. 29 U.S.C. § 794(b). The plain language of the Rehabilitation Act makes the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964 ("Title VI") [29 U.S.C. § 2000d *et seq.*] available to those whose rights under § 794(a) are violated. 29 U.S.C. § 794a(a)(2). Title VI provides for the termination of a covered entity's federal funding if that entity engages in prohibited forms of discrimination based on race, color, or national origin. 42 U.S.C. § 2000d-1. Although Title VI contains no express private right of action, the United States Supreme Court has construed it to contain an implied private right of action. *Barnes v. Gorman*, 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002). Because Congress has incorporated Title VI's remedial scheme into the Rehabilitation Act, individuals have a private right of action under § 794(a). *Three Rivers Center for Independent Living, Inc. v. Housing Authority of Pittsburgh*, 382 F.3d 412, 425-426 (3d Cir. 2004).

---

[3] The standards used for determining whether an employer has violated § 794(a) are the same as the standards used for determining whether an employer has violated Title I of the Americans with Disabilities Act of 1990 ("ADA") [42 U.S.C. § 12111 *et seq.*]. 29 U.S.C. § 794(d). On September 25, 2008, President George W. Bush signed the ADA Amendments Act of 2008 into law. Pub. L. No. 110-325; 122 Stat. 3553 (2008). This legislation, which takes effect on January 1, 2009, amended the ADA's definition of the term "qualified individual with a disability" in order to extend the ADA's protections to a broader class of individuals. *Id.*, § 4. This new standard will apply to cases brought under the Rehabilitation Act. *Id.*, § 7. By enacting this legislation, Congress has clearly expressed its intent to repudiate the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), and *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). *Id.*, ¶ 2. Nevertheless, there is nothing in the statutory language which suggests that this new legislation should be applied retroactively. Since the alleged discrimination at issue in this case occurred between 1997 and 1999, the general presumption that legislation is to be applied only prospectively would most likely defeat any argument to the effect that the newly enacted statute should be applied in this case. *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 141-142 (4th Cir. 2000). The Court need not resolve that issue, however, since the merits of Walstrom's claims will not be considered.

9

The Rehabilitation Act, which was originally enacted in 1973, does not contain its own statute of limitations. Consequently, the Court must "borrow" the most analogous statute of limitations available under Pennsylvania law. *North Star Steel Company v. Thomas*, 515 U.S. 29, 33-34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995). In *Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transportation Authority*, 539 F.3d 199, 208 (3d Cir. 2008), the United States Court of Appeals for the Third Circuit held that the applicable statute of limitations in Pennsylvania for claims arising under § 794(a) is the two-year statute of limitations for personal injury actions, which is codified at 42 PA. CONS. STAT. § 5524.[4] Therefore, to the extent that discrimination of the kind alleged by Walstrom was actionable under the Rehabilitation Act prior to December 1, 1990, the Court will apply Pennsylvania's two-year statute of limitations.

In order to mitigate the confusion caused by the borrowing of state statutes of limitations, Congress enacted a four-year default statute of limitations for federal causes of action arising under statutes enacted after December 1, 1990.[5] Pub. L. No. 101-650, § 313, 104 Stat. 5089, 5114-5115 (1990). This default statute of limitations is codified at 28 U.S.C. § 1658(a). In *Jones v. R.R. Donnelley*

---

[4]Subsection 2 establishes a two-year statute of limitations for actions "to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another." 42 PA. CONS. STAT. § 5524(2). Subsection 7 likewise establishes a two-year statute of limitations for other actions or proceedings "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct . . . ." 42 PA. CONS. STAT. § 5524(7).

[5]The statutory language provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990] may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a). The phrase "[e]xcept as otherwise provided by law" limits the default statute of limitations not only to those causes of action arising under federal statutes enacted after December 1, 1990, but also to those for which no express statutes of limitations are specifically created. Consequently, the default statute of limitations does not apply where Congress specifically codifies a specific statute of limitations for a particular cause of action.

10

*& Sons Company*, 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), the Supreme Court held that a cause of action is governed by § 1658(a)'s four-year statute of limitations if it was made possible by an amendment enacted subsequent to December 1, 1990, even if the original statute had been enacted prior to that date. Speaking through Justice Stevens, the Supreme Court explained:

> Nothing in the text or history of § 1658 supports an interpretation that would limit its reach to entirely new sections of the United States Code. An amendment to an existing statute is no less an "Act of Congress" than a new, stand-alone statute. What matters is the substantive effect of an enactment–the creation of new rights of action and corresponding liabilities–not the format in which it appears in the Code.

*Jones*, 541 U.S. at 381. The Supreme Court's decision in *Jones* abrogated the contrary decision of the United States Court of Appeals for the Third Circuit in *Zubi v. AT&T Corp.*, 219 F.3d 220 (3d Cir. 2000). *Couch v. Jabe*, 479 F.Supp.2d 569, 576-577 (W.D.Va. 2006)(recognizing that the Supreme Court, in *Jones*, had expressly rejected the holding in *Zubi*).

The Rehabilitation Act was originally enacted in 1973. Pub. L. No. 93-112; 87 Stat. 355 (1973). Thus, the general prohibition against disability-based discrimination on the part of recipients of federal financial assistance was in effect long before December 1, 1990. This proscription made it unlawful for a covered recipient to discharge an individual because of his or her disability. *Tuck v. HCA Health Services of Tennessee, Inc.*, 842 F.Supp. 988, 989-994 (M.D.Tenn. 1992). Covered employers were required to make "reasonable accommodations" for the limitations of disabled employees. *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1383 (3d Cir. 1991). Nevertheless, the Rehabilitation Act did not require a covered employer to transfer a disabled employee to a vacant position where necessary to accommodate his or her disability. *School Board of Nassau County v. Arline*, 480 U.S. 273, 289, n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)("Although *they are not*

11

*required to find another job for an employee who is not qualified for the job he or she was doing*, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies.")(emphasis added). Under the pre-1992 Rehabilitation Act, covered employers were merely precluded from denying disabled employees alternative positions for which they would have qualified under their employers' *existing policies*. *Fedro v. Reno*, 21 F.3d 1391, 1395-1397 (7th Cir. 1994); *Guillot v. Garrett*, 970 F.2d 1320, 1326-1327 (4th Cir. 1992).

On July 26, 1990, President George H.W. Bush signed the Americans with Disabilities Act ("ADA") into law. Pub. L. No. 101-336; 104 Stat. 327 (1990). Title I of the ADA, which proscribes disability-based discrimination in the employment context, became effective on July 26, 1992. Pub. L. No. 101-336, § 108; 104 Stat. 327, 337 (1990)("This title shall become effective 24 months after the date of enactment."). The substantive provision of Title I, which is codified at 42 U.S.C. § 12112(a), provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title I also provides rules of construction describing the meaning of the word "discriminate." The relevant statutory language provides:

**(b) Construction.** As used in subsection (a), the term "discriminate" includes--

\*\*\*

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

12

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant[.]

42 U.S.C. § 12112(b)(5)(A)-(B). These rules of construction make it clear that a covered employer's

failure to make "reasonable accommodations" for the benefit of a disabled employee constitutes

unlawful "discrimination" under the ADA.

The term "reasonable accommodation" is defined in 42 U.S.C. § 12111(9), which provides:

(9) Reasonable accommodation. The term "reasonable accommodation" may include--
(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9). Because § 12111(9)(B) includes "reassignment to a vacant position" within the

definition of "reasonable accommodation," and because a covered employer's failure to make a

"reasonable accommodation" for a disabled employee constitutes "discrimination" under Title I, an

employer's failure to transfer a disabled employee to a vacant position (where necessary to

accommodate his or her disability) constitutes a violation of Title I.

Shortly after Title I went into effect, Congress amended the Rehabilitation Act in order to

incorporate the ADA's substantive standards for determining whether a covered employer has engaged

in illegal "discrimination." Pub. L. No. 102-569, § 506; 106 Stat. 4344, 4428 (1992). This conforming

amendment, which is codified at 29 U.S.C. § 794(d), was signed into law by President George H.W.

Bush on October 29, 1992. 28 Weekly Comp. Pres. Doc. 2198 (Oct. 29, 1992). Since that date, the

13

standards for determining whether a covered employer has violated § 794(a) have been coextensive with the standards for determining whether a covered employer has violated Title I.[6] 29 U.S.C. § 794(d). Consequently, employers covered under § 794(a) are now required to transfer disabled employees to vacant positions where necessary to accommodate their disabilities, provided that such transfers do not impose "undue hardships" on the operations of such employers. 42 U.S.C. § 12112(b)(5)(A).

In *Shiring v. Runyon*, 90 F.3d 827, 831-832 (3d Cir. 1996), the United States Court of Appeals for the Third Circuit explicitly recognized § 794(d) as the statutory provision requiring an employer covered under § 794(a) to transfer a disabled employee to a vacant position where necessary to accommodate his or her disability. Section 794(d), of course, was not enacted until October 29, 1992. Prior to that date, an employer's failure to transfer a disabled employee was not actionable under the Rehabilitation Act. *Bratten v. SSI Services, Inc.*, 185 F.3d 625, 633 (6th Cir. 1999)("Prior to 1992, the Rehabilitation Act did not include reassignment to a vacant position as a reasonable accommodation."); *Gile v. United Airlines*, 95 F.3d 492, 496-497 (7th Cir. 1996)("Until recently, the Rehabilitation Act and its regulations did not include reassignment to a vacant position within the list of potential reasonable accommodations."). Since "failure to transfer" claims under the Rehabilitation Act can be brought solely because of a statutory amendment enacted after December 1, 1990, they are subject to the four-year statute of limitations prescribed by § 1658(a) rather than the two-year statute of limitations

---

[6]Title I of the ADA is Commerce Clause legislation which limits the actions of "employers." Title I defines the term "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . ." 42 U.S.C. § 12111(5)(A). Section 794(a) of the Rehabilitation Act is Spending Clause legislation which limits the actions of certain recipients of federal financial assistance. 29 U.S.C. § 794(a)-(b). The substantive provisions contained in Title I and § 794(a) are not redundant, since some entities are covered by only one of the two statutes.

14

prescribed by § 5524.[7] *Jones*, 541 U.S. at 382. This conclusion is consistent with the Court's analysis in *Chedwick v. UPMC*, Civil Action No. 07-806, 2007 WL 4390327, at \*7-13, 2007 U.S. Dist. LEXIS 91181, \*21-42 (W.D.Pa. December 12, 2007), which addressed this same issue.

In her Complaint, Walstrom asserts that Altoona would not have endured an "undue hardship" had it accommodated her "either in her prior position or in another available position." Document No. 1, ¶ 42. Thus, it appears that her Rehabilitation Act claims rest on two separate theories, one of which was viable before December 1, 1990, and one of which did not become viable until October 29, 1992. The difficulty in characterizing Walstrom's claims as arising under either the pre-1992 Rehabilitation Act or under the post-1992 Rehabilitation Act illustrates how complex the analysis required under *Jones* can be. Nevertheless, it is clear that Walstrom's claims are time-barred regardless of whether they are subject to the two-year statute of limitations prescribed by § 5524 or the four-year statute of limitations prescribed by § 1658(a). The Court will explain why that is the case, beginning with § 5524 and ending with § 1658(a).

It is undisputed that Walstrom learned of her discharge on May 24, 1999. Document No. 40-5, p. 18. This action was not commenced until April 7, 2006. Document No. 1. Consequently, a little less than seven years elapsed between the date of Walstrom's discharge and the commencement of this

---

[7] The Court acknowledges that, even before 1992, "failure to transfer" claims were viable under the Rehabilitation Act in circumstances where employers had denied disabled employees "alternative employment opportunities reasonably available under the employer[s'] existing policies." *School Board of Nassau County v. Arline*, 480 U.S. 273, 289, n. 19, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Nonetheless, the Court does not understand Walstrom's "failure to transfer" argument to be premised on the theory that, because she was disabled, Walstrom was denied a transfer that a nondisabled employee would have received. Instead, the Court understands Walstrom to argue that Altoona "discriminated" against her by not providing her with the "reasonable accommodation" of a "transfer to a vacant position." "Failure to transfer" claims of the kind asserted by Walstrom did not become actionable under the Rehabilitation Act until the enactment of § 794(d) in 1992.

15

action. Given the long lapse of time between the challenged action and the filing of Walstrom's Complaint, the dispute as to which statute of limitations applies in this case would, at first glance, appear to be purely academic. Nonetheless, Walstrom contends that she tolled the applicable statute of limitations on January 4, 2001, when she filed a praecipe for a writ of summons in the Pennsylvania Court of Common Pleas of Blair County. Document No. 40, pp. 12-13. The praecipe, of course, named both Altoona and Treese as defendants. Document No. 40-8, p. 1. The question for consideration is whether the statute of limitations applicable to this action was tolled by the filing of the praecipe. The Supreme Court has recognized that the "borrowing" of a State's statute of limitations necessarily entails the incorporation of that State's tolling rules. *Hardin v. Straub*, 490 U.S. 536, 538-544, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989). Therefore, the question of which statute of limitations applies in this case matters not because of the duration of the applicable limitations period, but rather because of the tolling rules that must be applied in this situation. Since the Court understands Walstrom's Rehabilitation Act claims to rest on two different theories (one of which would render her claims subject to Pennsylvania's tolling rules and the other of which would render her claims subject to federal tolling rules), the Court will evaluate the issue of tolling from both perspectives.

The first issue for consideration is whether the filing of the praecipe tolled the two-year statute of limitations prescribed by § 5524, to the extent that Walstrom's claims are based on conduct by Altoona that would have been actionable under the Rehabilitation Act prior to October 29, 1992. This issue is very similar to that faced by the Court in *Baranowski v. Waters*, Civil Action No. 05-1379, 2008

16

WL 728366, at \*7-12, 2008 U.S. Dist. LEXIS 21301, at \*10-40 (W.D.Pa. March 18, 2008).[8] In accordance with that decision, the Court holds that the filing of the praecipe did not toll § 5524's two-year statute of limitations, and that Walstrom's Rehabilitation Act claims are time-barred to the extent that they are based on conduct that would have been actionable prior to the enactment of § 794(d) in 1992. The Court will briefly explain the basis for this holding.

In order to determine whether the filing of the praecipe tolled Pennsylvania's two-year statute of limitations, the Court must look to Pennsylvania law. *Callwood v. Questel*, 883 F.2d 272, 274-275 (3d Cir. 1987). Under Pennsylvania Rule of Civil Procedure 1007, the filing of a praecipe constitutes the commencement of a civil action. *Pa. R. Civ. P. 1007.* Hence, when Walstrom filed her praecipe in the Court of Common Pleas, she commenced an action against Altoona and Treese. It is undisputed that the praecipe was filed within the two-year limitations period. If *that* action had been pursued by Walstrom and subsequently removed to this Court by Altoona pursuant to 28 U.S.C. § 1441, there would be no statute of limitations problem. *Heater v. Kidspeace*, Civil Action No. 05-4545, 2005 WL 2456008, at \*2, 2005 U.S. Dist. LEXIS 22512, at \*5 (E.D.Pa. October 5, 2005). The question presented in this case, however, is whether the filing of a distinct action in a Pennsylvania court tolled the statute of limitations applicable to this action.

The Court's analysis must begin with the statutory language governing this situation. Like many jurisdictions, Pennsylvania has codified rules governing the effect that the commencement of one action

---

[8]The portion of the opinion in *Baranowski* addressing the application of the statute of limitations was subsequently vacated by the Court, which ultimately determined that the defendants in that case had waived their statute of limitations defense with respect to the issue of tolling. *Baranowski v. Waters*, Civil Action No. 05-1379, 2008 WL 4000406, at \*6-16, 2008 U.S. Dist. LEXIS 64802, at \*16-51 (W.D.Pa. August 25, 2008). Aside from the issue of waiver, however, this vacatur did not impugn the Court's earlier rationale concerning the application of the statute of limitations. *Id.*

17

has on the statute of limitations applicable to a related action that is commenced at a later time.

Pennsylvania's "savings statute," which is codified at 42 PA. CONS. STAT. § 5535(a), provides:

### § 5535. Effect of other actions and proceedings
### (a) Termination of prior matter.--

(1) If a civil action or proceeding is timely commenced and is terminated, a party, or his successor in interest, may, notwithstanding any other provision of this subchapter, commence a new action or proceeding upon the same cause of action within one year after the termination and any other party may interpose any defense or claim which might have been interposed in the original action or proceeding.

(2) Paragraph (1) does not apply to:

(i) An action to recover damages for injury to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.

(ii) An action or proceeding terminated by a voluntary nonsuit, a discontinuance, a dismissal for neglect to prosecute the action or proceeding, or a final judgment upon the merits.

42 PA. CONS. STAT. § 5535(a). As the United States Court of Appeals for the Third Circuit recently

observed in *Jewelcor, Inc. v. Karfunkel*, 517 F.3d 672, 675 (3d Cir. 2008), the Pennsylvania courts have

consistently held that § 5535(a)(1)'s savings provision applies only where a civil action is first

commenced in a Pennsylvania court (and subsequently terminated), and that the commencement of an

action in a federal court does not toll the running of the limitations period applicable to an action

subsequently filed in a Pennsylvania court. *Ravitch v. Price Waterhouse*, 793 A.2d 939, 942

(Pa.Super.Ct. 2002); *Maxwell Downs v. City of Philadelphia*, 638 A.2d 473, 476 (Pa.Commw.Ct.

1994). The decisions rendered by both federal courts and Pennsylvania courts also indicate that the

commencement of an action in a Pennsylvania court does not toll the statute of limitations applicable

to a subsequent action commenced in a federal court. *Ravitch*, 793 A.2d 942. In *Stinson v. Kaiser*

*Gypsum Company, Inc.*, 972 F.2d 59 (3d Cir. 1992), the United States Court of Appeals for the Third

18

Circuit explained:

> While a timely filed complaint or praecipe for writ of summons satisfies the statute of limitations under Pennsylvania law as far as *that action* is concerned, the Pennsylvania rule as to new actions is the same as the generally accepted rule. If a timely filed action is dismissed after the limitations period measured from the accrual of the claim, has run, *a new action* on the same claim is time barred unless a limitations savings statute provides otherwise.

*Stinson*, 972 F.2d at 62 (emphasis added). It is clear from the language used by the Court of Appeals in *Stinson* that Pennsylvania's statute of limitations principles (and related tolling principles) operate with respect to a specific *action*. Pennsylvania law recognizes a distinction between the action commenced by Walstrom in the Court of Common Pleas and the action commenced by Walstrom in this Court. The general rule is that "[t]he running of a Pennsylvania statute of limitations against a federal cause of action is not tolled under Pennsylvania concepts of tolling by the commencement of a similar suit in state court." *Ammlung v. City of Chester*, 494 F.2d 811, 816 (3d Cir. 1974).

Whether that general rule bars Walstrom's Rehabilitation Act claims in this case depends on whether such claims are "saved" by § 5535(a)(1). For the same reasons identified by the Court in *Baranowski*, § 5535(a)(1) does not "save" Walstrom's Rehabilitation Act claims. First of all, the plain language of § 5535(a)(1) indicates that a prior civil action must be both "timely commenced" and "terminated" in order for the savings provision to be operative. 42 PA. CONS. STAT. § 5535(a)(1). There is no indication from the parties that the action commenced in the Court of Common Pleas has been terminated. As far as the Court can tell, it is still pending as of today. Consequently, Walstrom "has failed to satisfy a statutory prerequisite for the otherwise untimely commencement of a new action (*i.e.*, the termination of the previous action)." *Baranowski*, 2008 WL 728366, at \*10, 2008 U.S. Dist.

LEXIS 21301, at *32.

The exceptions to the savings statute, which can be found in § 5535(a)(2), further confirm that § 5535(a)(1) does not "save" Walstrom's Rehabilitation Act claims.[9] Even if the Court is incorrect in its assumption that Walstrom's prior suit was never "terminated" within the meaning of § 5535(a)(1), § 5535(a)(2)(ii) excludes from the savings provision an "action or proceeding" dismissed "for neglect to prosecute the action or proceeding . . . ." 42 PA. CONS. STAT. § 5535(a)(2)(ii). In her brief, Walstrom implicitly concedes that she never filed a complaint in the Court of Common Pleas. Document No. 40, pp. 12-13. She evidently abandoned her first action in order to pursue this one. The language of § 5535(a)(2)(ii), however, evinces a legislative intent to preclude a plaintiff from pursuing an untimely-filed action after having failed to pursue a timely-filed action. Since Walstrom has apparently failed to prosecute her action in the Court of Common Pleas, she cannot reap the benefits of the savings statute. *Baranowski*, 2008 WL 728366, at *11, 2008 U.S. Dist. LEXIS 21301, at *36-37.

An additional exception to the savings statute can be found in § 5535(a)(2)(i), which provides that § 5535(a)(1) does not apply to "[a]n action to recover damages for injury to the person . . . ." 42 PA. CONS. STAT. § 5535(a)(2)(i). This statutory language unambiguously excludes "personal injury actions" from the operation of the savings statute. *Stinson*, 972 F.2d at 63. In *Disabled in Action of Pennsylvania*, the Court of Appeals held that the statute of limitations applicable to claims arising under

___

[9]Subsection (b) provides that "[w]here the commencement of a civil action or proceeding has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action or proceeding must be commenced." 42 PA. CONS. STAT. § 5535(b). Since there was no stay which interfered with Walstrom's ability to bring this action, Subsection (b) is inapplicable to this case. The same is true of Subsection (c), which provides for tolling during the period of time between a demand for arbitration and a subsequent determination by a court that no obligation to arbitrate exists. 42 PA. CONS. STAT. § 5535(c). Walstrom does not contend that there was an impediment to her filing of this action in a timely manner. Accordingly, only Subsection (a) is relevant to this case. *Baranowski v. Waters*, 2008 WL 728366, at *10, 2008 U.S. Dist. LEXIS 21301, at *31-32, n. 7.

20

§ 794(a) is "the statute of limitations for *personal injury actions* in the state in which the trial court sits." *Disabled in Action of Pennsylvania*, 539 F.3d at 208 (emphasis added). To the extent that Walstrom's claims arise under the pre-1992 Rehabilitation Act, they are governed by a two-year statute of limitations precisely because that is Pennsylvania's limitations period for *personal injury actions*. *Id.* Because actions arising under § 794(a) have been categorically characterized as "personal injury actions" for statute of limitations purposes, Walstrom's claims must be treated in the same manner as personal injury claims arising under Pennsylvania law. Since the plain language of § 5535(a)(2)(i) would preclude Walstrom from pursuing personal injury claims under these circumstances, the Court holds that she is likewise precluded from pursuing claims under the pre-1992 Rehabilitation Act. *Baranowski*, 2008 WL 728366, at *10-11, 2008 U.S. Dist. LEXIS 21301, at *32-36. The filing of the praecipe in the Court of Common Pleas tolled the statute of limitations as to *that action*, but it did not toll the statute of limitations as to *this action*. *Morris v. Hoffa*, Civil Action No. 01-3420, 2002 WL 524037, at *3, 2002 U.S. Dist. LEXIS 5975, at *9-10 (E.D.Pa. April 8, 2002). Given that the limitations period had already run before the commencement of this action, Walstrom's claims under the pre-1992 Rehabilitation Act are time-barred.

As noted earlier, the enactment of § 794(d) enlarged the category of conduct prohibited by the Rehabilitation Act. *Shiring*, 90 F.3d at 831 ("Before 1992, disabled individuals had to prove that they were qualified only for the job that they were employed to do."). Walstrom appears to base her Rehabilitation Act claims, at least in part, on Altoona's alleged failure to transfer her to "another available position." Document No. 1, ¶ 42. Through her attorney, Walstrom informed Eggert that she was "unable to return to duty." Document No. 40-5, p. 15. Altoona proceeded to discharge Walstrom.

*Id.*, p. 18. To the extent that Walstrom contends that Altoona engaged in prohibited "discrimination" by opting to discharge her rather than offering her the "reasonable accommodation" of a "transfer to a vacant position," she bases her claims on conduct that was not actionable under the Rehabilitation Act prior to October 29, 1992. Claims premised on this category of conduct are subject to the four-year statute of limitations prescribed by § 1658(a) rather than the two-year statute of limitations prescribed by § 5524. *Jones*, 541 U.S. at 381-383; *Chedwick*, 2007 WL 4390327, at *8-13, 2007 U.S. Dist. LEXIS 91181, at *24-42. It is undisputed that almost seven years elapsed between the date of Walstrom's discharge and the date on which she commenced this action. Hence, the four-year duration of the federal limitations period is of no help to Walstrom. The critical question is whether the filing of the praecipe in the Court of Common Pleas tolled the statute of limitations applicable to this action under the relevant federal tolling rules.

In *Willard v. Wood*, 164 U.S. 502, 17 S.Ct. 176, 41 L.Ed. 531 (1896), the Supreme Court observed:

> The general rule in respect of limitations must also be borne in mind, that if a plaintiff mistakes his remedy, in the absence of any statutory provision saving his rights, or where from any cause a plaintiff becomes nonsuit or the action abates or is dismissed, and, during the pendency of the action, the limitations runs, the remedy is barred.

*Willard*, 164 U.S. at 523. Accordingly, the general federal rule concerning the issue of tolling is that the commencement of one action does not toll the statute of limitations applicable to another. "In other words, a suit dismissed without prejudice is treated for statute of limitations purposes as if it had never been filed." *Elmore v. Henderson*, 227 F.3d 1009, 1011 (7th Cir. 2000).

The question for consideration is whether some provision of federal law exempts Walstrom's

22

claims from the "general rule." In her brief, Walstrom offers no basis for such an exemption.[10] Document No. 40, pp. 12-13. The Court notes that 28 U.S.C. § 1367(d) tolls the running of a state statute of limitations while a state claim is pending before a federal court pursuant to the supplemental jurisdiction statute, and for an additional thirty days after the dismissal of such a claim. 28 U.S.C. § 1367(d). This tolling provision was enacted as a part of § 310 of the Judicial Improvements Act of 1990. Pub. L. No. 101-650, § 310; 104 Stat. 5089, 5114 (1990). Section 313 of that same Act of Congress added § 1658(a)'s four-year statute of limitations to the United States Code. Pub. L. No. 101-650, § 313; 104 Stat. 5089, 5114-5115 (1990). Even though Congress expressly provided for the tolling of the statutes of limitations applicable to state claims while such claims are pending before a federal court, it did not provide for the tolling of the federal statute of limitations while federal claims are pending before a state court. Because the enactment of § 1367(d) demonstrates Congress' awareness of its ability to enact a tolling provision, the omission of a similar tolling provision within the text of § 1658(a) illustrates that Congress did not intend for the four-year statute of limitations to be tolled while a federal claim is pending before a state court.[11] *United States v. Bly*, 510 F.3d 453, 461, n. 11

---

[10] On May 2, 2008, Altoona filed a reply brief in which the issue of tolling was discussed in detail. Document No. 45. On May 23, 2008, the Court granted Walstrom leave to file a responsive brief, but she never availed herself of that opportunity. Document No. 48.

[11] The commencement of the action in the Court of Common Pleas raises no bar to the commencement of a separate action in this Court. Although § 1367(d) was enacted primarily to eliminate the need for a plaintiff to file separate actions, a plaintiff nevertheless retains the option to file concurrent actions in federal and state courts. *Jinks v. Richland County*, 538 U.S. 456, 463-464, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003). If Walstrom had commenced this action in a timely manner, the merits of her claims would have been before the Court for resolution. Since there has been no decision rendered by a Pennsylvania court with respect to the action commenced in the Court of Common Pleas, the doctrines of *res judicata* and collateral estoppel, which are applicable to this Court by virtue of 28 U.S.C. § 1738, would not preclude this Court's adjudication of the merits of Walstrom's claims. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 293, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Unfortunately for Walstrom, she did not commence this action until the applicable statutes of limitations had already run.

23

(4th Cir. 2007). Consequently, the filing of the praecipe in the Court of Common Pleas did not toll the running of § 1658(a)'s four-year statute of limitations.[12]

For the foregoing reasons, the Court holds that Walstrom's claims under the Rehabilitation Act are barred by the statutes of limitations prescribed by §§ 5524 and 1658(a).[13] Altoona's Motion for Summary Judgment will be granted with respect to all claims asserted by Walstrom under the Rehabilitation Act.

## B. The Pennsylvania Human Relations Act Claims

The PHRA makes it unlawful "[f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability . . . to bar or to discharge from employment such individual . . . ." 43 PA. STAT. § 955(a). It is undisputed that Altoona is an "employer" within the meaning of 43 PA. STAT. § 954(b). The PHRA contains a requirement that an individual exhaust his or her administrative remedies with the PHRC before commencing an action against his or her employer. 43 PA. STAT. §§ 959, 962. This remedial scheme is invoked by the filing of a complaint with the PHRC. 43 PA. STAT. § 959(a). The statutory language contained in 43 PA. STAT. § 959(h) makes it clear that any complaint filed pursuant to the PHRA "must be so filed within one hundred eighty days after the alleged act of discrimination . . . ." 43 PA. STAT. § 959(h).

---

[12]Although not directly relevant to the issue of tolling, Walstrom's filings before the PHRC indicate that her action in the Court of Common Pleas was not based on allegations of unlawful discrimination. In those filings, Walstrom stated that her action in the Court of Common Pleas was based on alleged violations of the Due Process Clause. Document No. 31-11, pp. 10, 22.

[13]Since Walstrom stipulates to the dismissal of her § 1983 claim, the Court need not address the statute of limitations issues surrounding that claim. Document No. 40, p. 15. Nevertheless, the same reasoning would warrant a determination that her § 1983 claim is time-barred. *Baranowski v. Waters*, Civil Action No. 05-1379, 2008 WL 728366, at *7-12, 2008 U.S. Dist. LEXIS 21301, at *21-40 (W.D.Pa. March 18, 2008).

24

Walstrom first learned of her discharge on May 24, 1999. Document No. 40-5, p. 18. She did not file her complaint with the PHRC until February 2, 2001. Document No. 31-11, p. 10. Consequently, her claims are presumptively time-barred. Walstrom attempts to save her PHRA claims by arguing that she did not learn of the unlawful reasons for her discharge (*i.e.*, her sex and her disability) until August 25, 2000, when Carnicella allegedly told James that Walstrom had been discharged because of her sex and her disability. Document No. 40, p. 13. In her filings with the PHRC, Walstrom made reference to this conversation. Document No. 31-11, p. 12. Walstrom contends that the 180-day limitations period began to run not when she learned that she had been discharged, but rather when she learned *why* she had been discharged. Document No. 40, p. 13.

Although the PHRA is a statute of independent force, the Pennsylvania courts generally construe its provisions in the same manner as analogous federal anti-discrimination provisions. *Stultz v. Reese Brothers, Inc.*, 835 A.2d 754, 759 (Pa.Super.Ct. 2003). Therefore, the Court can look to decisions interpreting federal anti-discrimination statutes for guidance as to how the PHRA should be construed. The United States Court of Appeals for the Third Circuit has recognized that the accrual date of a cause of action "is not the date on which the wrong that injures the plaintiff occurs, but the date on which the plaintiff *discovers* that he or she has been injured." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 (3d Cir. 1994)(emphasis in original). This "discovery rule" operates to toll the running of the limitations period until the plaintiff has notice (actual or constructive) that he or she has been wronged by another. *Id.* at 1386 ("Thus, the 'polestar' of the discovery rule is not the plaintiff's actual knowledge of injury, but rather whether the knowledge was known, or through the exercise of reasonable diligence, knowable to the plaintiff."). Nevertheless, the Court of Appeals has been careful

25

to emphasize that the application of the discovery rule depends on a plaintiff's knowledge of *actual* injury, not on his or her knowledge of *legal* injury. *Podobnik v. United States Postal Service*, 409 F.3d 584, 590 (3d Cir. 2005). The discovery rule delays the start of the limitations period, but only until the plaintiff has discovered (1) that he or she has been injured, and (2) that his or her injury has been caused by another party's conduct. *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124 (3d Cir. 1997). It does not delay the start of the limitations period until the plaintiff discovers that the precise legal nature of his or her injury implicates a particular statutory prohibition. *Podobnik*, 409 F.3d at 590-591.

Walstrom was aware of her actual injury (*i.e.*, her discharge) on May 24, 1999. It is of no moment that she may not have recognized the legal significance of that injury (*i.e.*, the allegedly illicit reasons for Altoona's decision to terminate her) until August 25, 2000. This same principle applies to Walstrom's claim that Altoona engaged in sex-based discrimination when it failed to offer her a promotion in 1997. It is clear from the record that Walstrom "was upset" as early as January 1999 that she had not received the promotion. Document No. 41, pp. 12-13, ¶ 44. It is of no significance that she may not have realized until August 25, 2000, that her sex had potentially been a motivating or determinative factor in Altoona's decision not to promote her. The applicability of the discovery rule turns on one's awareness of his or her injury, not on his or her awareness of the legal significance of that injury. *Podobnik*, 409 F.3d at 590-591. Accordingly, Walstrom cannot rely on the discovery rule to save her PHRA claims.

The time limitations for filing complaints under the PHRA are "subject to waiver, estoppel and equitable tolling." 43 PA. STAT. § 962(e). Nevertheless, restrictions on equitable tolling must be

26

"scrupulously observed." *Shaver v. Corry Hiebert Corp.*, 936 F.Supp. 313, 316 (W.D.Pa. 1996). Although the permissible applications of equitable tolling are not reducible to an exclusive list, equitable tolling is typically permitted only (1) where the defendant affirmatively misleads the plaintiff with respect to a particular cause of action; (2) where extraordinary circumstances prevent the plaintiff from asserting his or her rights in a timely manner; or (3) where the plaintiff has timely asserted his or her rights in the wrong forum. *Uber v. Slippery Rock University*, 887 A.2d 362, 366 (Pa.Commw.Ct. 2005). In this case, Walstrom does not contend that she was actively misled by Altoona, or that extraordinary circumstances somehow prevented her from filing a timely complaint with the PHRC. Additionally, she did not file a praecipe for a writ of summons in the Court of Common Pleas until January 4, 2001, which was roughly a year after the 180-day limitations period had already run. Document No. 40-8, p. 1. Even if she had filed her praecipe within the 180-day limitations period, Walstrom clearly stated in her subsequent filings with the PHRC that the action commenced in the Court of Common Pleas was based on the Due Process Clause, and that it was not related to the charges of discrimination supporting her administrative complaint under the PHRA. Document No. 31-11, pp. 10, 22. Thus, it cannot be said that Walstrom mistakenly asserted her rights under the PHRA in the wrong forum. Courts tend to disfavor equitable tolling in circumstances where the untimeliness of a complaint appears to be due solely to the plaintiff's lack of due diligence. *Altopiedi v. Memorex Telex Corp.*, 834 F.Supp. 800, 806 (E.D.Pa. 1993). There is no basis for applying the doctrine of equitable tolling in this case.

The PHRA provides that an individual's private right of action in the courts is not foreclosed if he or she properly invokes the procedures set forth therein. 43 PA. STAT. § 962(c)(1). Had Walstrom

exhausted her administrative remedies with the PHRC in a timely manner, she would have been able to proceed against Altoona under the PHRA. Since she failed to file a timely complaint with the PHRC, she cannot maintain her action against Altoona for alleged violations of the PHRA. *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917, 921 (Pa. 1989). Accordingly, the Court will grant Altoona's Motion for Summary Judgment with respect to Walstrom's claims under the PHRA.

## VI. CONCLUSION

The Court has determined that all of Walstrom's claims are barred by the applicable statutes of limitations. Consequently, the Court has no occasion to consider the merits of these claims. Altoona's Motion for Summary Judgment will be granted. An appropriate order follows.

**AND NOW**, this 29th day of December, 2008, this matter coming before the Court on the Motion for Summary Judgment filed by the Defendant pursuant to Federal Rule of Civil Procedure 56 (Document No. 28), IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment is **GRANTED**.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

28